Thank you, Your Honor. Good morning. My name is Stephanie Adractas, and I represent the petitioner Thomas Winter. Miranda warnings must be given before the police may conduct a custodial interrogation, but the Miranda rule would have no meaningful effect if the police are permitted to obtain a complete confession before providing the warnings based on the notion that they didn't think that the suspect was in custody until after he confessed. In this case, Winter's first and second confessions should have been suppressed because the police obtained both statements in violation of Miranda and of the decision in Oregon v. Elstad. Counsel, you're arguing as if we get to decide this anew, but isn't this governed by EBPA? Your Honor, the case is governed by the AEDPA, but I would submit, and throughout my brief, I argued that the second decision of the California Court of Appeal in Winter II was objectively unreasonable, and so it meets the AEDPA standard for granting relief. There is no bar, because in Winter II, the Court found that the police, that there wasn't any evidence of deliberate delay or that they actually credited the police testimony that because they thought Winter was in custody, they didn't think that they had to advise him. But that's simply not credible on this record. It was an objectively unreasonable determination. There was clearly deliberate delay in this case, because beginning at the inception of the interrogation, the police persistently accused Winter of guilt. This was a situation where Mr. Howell had left the bar with Winter and Wotniak, and the police knew that from viewing the videotape prior to the interrogation. They'd been investigating this case for six days before they interrogated Winter. They had looked at the videotape. They knew that he and his friend had left the bar with the victim and that the victim was dead about 20 minutes later on the road. So at the point when they detained Mr. Winter at the side of the road, when they transported him to the police station, put him in a little room with two detectives and started talking to him, they knew he was in custody because nobody in Winter's position at that point would have felt like he was free to leave. The police testified, the detectives, Grooms and Minor, testified at the suppression hearing that, well, we thought we had to eliminate the possibility of accident or the possibility that Mr. Winter was acting in self-defense before we really thought that he was in custody. I mean, first, that's a misunderstanding or misapplication of the custody standard, because it doesn't matter whether the police were trying to credit or eliminate defenses. What mattered is how they treated him and whether it was custodial from his point of view. And secondly, that those excuses just don't make any sense on this record. The body, when it was found, he had been bludgeoned with a tire iron at least five times and driven over with a vehicle. What difference does it make that he was told in that interview that he wasn't under arrest and he was, in fact, free to leave, which he repeated back to them a little later in the interview, and he said, I think I'd like to talk to my mom. And I'm free to leave, right? And they said yes. Well, Your Honor, it's clear, excerpts of Record 221, that's the first time Mr. Winter actually asked to leave. He said, I'd like to leave if I could. And instead of letting him leave, the police continued to interrogate him and continued to accuse him of being the person who had killed Mr. Howell. So, in fact, objectively, nobody prior to the first confession in Winter's shoes would have believed that he was actually free to leave, even though the police told him he was. The truth was, he wasn't free to leave. And so we don't actually know that because he didn't try to leave. So it's difficult to determine. I mean, you're saying that no one could believe it, but I'm not sure why that would have to be true. Well, Your Honor, when Mr. Winter said, excerpts of Record 221, I'd like to leave if I could, that's a request to leave. I mean, if the officers truly had been willing to allow him to leave, they would have stopped questioning him and said, okay. Instead, they kept questioning him and they kept accusing him. And it's clear that a person in Winter's shoes would not have felt like he could just get up and leave. He'd been detained at the side of the road by police. He'd been transported to the station. He was in a small room with two detectives who were accusing him of murder. There's no reasonable person in his shoes would have thought that he was actually free to leave. And for that reason, the court of appeal opinion in Winter 2 was an objectively unreasonable application of ELSTAD. The other flaw in the reasoning around custody was that the police didn't actually make any effort to eliminate the defenses that they said they were trying to eliminate, accident and self-defense. If one reads that transcript, what they're actually trying to do is coerce Mr. Winter into admitting that he's the person who left the bar with Mr. Howell. And they tell him repeatedly, we've talked to all these witnesses. They all say it's you. You know, you're lying. You have to be truthful with us. So they're pressuring and coercing him. They're not trying to eliminate the possibility of an accident. They know this wasn't an accident. So what did he say that was incriminating and used against him after his Miranda rights were given? I'm interested in the ELSTAD question. And the law, of course, is somewhat different now than it was at the time he was being interrogated and at the time of trial. So what did he say that was inculpatory after the Miranda rights were read to him? Your Honor, the section after the Miranda rights were read begins at excerpt of the record, I believe it's 237. And Mr. Winter gives a very complete and full confession that is cited repeatedly by the prosecutor. He said that he... Right. ...earlier interrogation evidence as allowed in by the state court. It seems to me that that would be harmless given how much was – how much evidence or how much inculpatory confession he gave after Miranda. And I'm not sure ELSTAD permits us under EDPA to say that it had to be excluded. How do we deal with that? Your Honor, the ELSTAD decision, because – I submit that because there was a deliberate delay, it does require suppression under these circumstances. But I understand the Court's question is that, well, the... Well, you see, I'm not sure ELSTAD – that's the way I would prefer to read ELSTAD. But we have a decision of our own court before we get the Siebert case that doesn't read it that way. Understood, Your Honor. Your Honor, it's – what I try to explain in my briefs, I believe that Siebert gives us an explanation and an explication of ELSTAD that supports my position here. I recognize that under the ADPA, I can't argue that Siebert directly applies. However, I do think it's enlightening in terms of telling us how the Supreme Court interpreted ELSTAD. And if one applies those same – that same standard here, ELSTAD does require relief for Mr. Winter. And I'm cognizant of the extreme differences between what happened in the interrogation of Mr. Winter and Mr. ELSTAD. But I think it supports my position that ELSTAD requires suppression of the second, more – much more prejudicial statement, which is after Miranda. There were statements made that were admitted at the second trial. And I understand your point, Judge Fletcher, that they were not nearly as incriminating as what he said after the Miranda rights were given. However, they were admissions that he was with Howell. And given the narrow time frame we have here between leaving the bar and the time of the murder, admitting that he left with him and saying things like, we chickened out, is essentially – it's an admission that was important. There was a difference in the verdict between the first and second trial, even though one confession was excised, the other one was admitted. But the jury came out with different verdicts on two of the special circumstances, that being that they found he wasn't lying in wait and didn't use the truck as a deadly weapon in the second trial. So there was a material difference between how the jury came out, even with the excision that was done for the first Miranda violation. And I want to touch on the issue of custody as well and the unreasonable determination, because, you know, Your Honor makes the point that the AEDPA confines this Court's decision-making process. However, once the Court makes a determination that there was an objectively unreasonable determination of fact, that's no longer the case. And I think that's what occurred here with the determination of custody, because no – as I said earlier, no reasonable person in Winter's position would have felt he was free to leave. And if one looks at the court of appeal decision in Winter 1, it does stand in contrast to the court of appeal decision in Winter 2 in terms of how they viewed the custody status that Mr. Winter was in at the time he was taken in for interrogation. The first opinion is much more sympathetic to his position. It points out that anybody who was detained at the side of the road and repeatedly accused would have believed that he was in custody. What doesn't make sense about Winter 1 is that the Court then goes on to say it wasn't until his second request to leave was rebuffed that he was actually in custody. That doesn't make sense. One would certainly, when one says, as Mr. Winter did, I'd like to leave if I could, and the police ignore you and keep accusing you of murder, you can't leave at that point. So one – this Court could look even to the first decision in Winter 1 to find that there was objective unreasonableness in the State court decision and that this case is not confined by the AEDPA. Thank you, counsel. Your time has expired, and we'll hear from the Respondent. May it please the Court, my name is Tammy Krenz, and I represent the Respondent, Warden Scribner. This case comes down to the admissibility of the Mirandai statement. The prior statement only put the – Mr. Winter in the car with the victim, and he said they chickened out going – and presumably the State court found because they were going to do some pot together when the victim started using offensive language. Based on the full confession that was given after the Miranda rights, the pretrial statements, whether excluded or not, wouldn't make any difference in this case. So the crux of the case is what – whether the post-Miranda statement was admissible or not. In controlling Supreme Court precedent, and we're under the AEDPA statute, and as this Court is very well aware, the – Mr. Winter has a significant hurdle to meet here, and he has to show that there is no apparent basis for any fair-minded jurist disagreement. And based on the Supreme Court's decision in ELSTAT, this – ELSTAT simply does not clearly establish the result that Mr. Winter is looking for. ELSTAT only established that an unwarned yet uncoercive statement does not render a subsequent Mirandai statement inadmissible. That in no way dictates under what circumstances a – if any, a coerced statement could render that subsequent Mirandai statement inadmissible. And here, the issue is coercion, and whether there was actual coercion. And again, there's no Supreme Court case that even addresses what would happen under those circumstances. And the proposition that Siebert actually – which, of course, does not apply in this case because it wasn't clearly established at that time, but I would also suggest to this Court, too, that Siebert doesn't dictate this – wouldn't dictate this result, and ELSTAT certainly did not dictate the result in Siebert. And particularly because there's no evidence of a deliberate two-step process here where the officers, at the point that it became clear that the defendant felt that he couldn't leave, they Mirandized him, and then he subsequently gave a full confession. And I also – and I don't know if this Court has had a chance to look at the videotape, but invite you to look at that. This is not a coercive by constitutional standards interview. This is – was a very low-key, as the District Court and State Court found, interview. It was short. There were no implied threats or promises. There was no sleep deprivation, no food deprivation, no suggestion of a juvenile – or he wasn't a juvenile. And he was also acquainted with the criminal justice system. And so there simply just isn't a coercive element here, and certainly no clearly established authority that would dictate that this post-Miranda statement is inadmissible. Unless this Court has further questions, I'll submit. I don't believe that we do. Thank you. Thank you, counsel. And you had used up your time earlier, so the case just argued is submitted. And again, we appreciate the helpful arguments of counsel.
judges: Graber, Fletcher, Paez